**UNITED STATES of America,**
**Petitioner-Plaintiff,**

v.

**ONE PARCEL OF LAND SITUATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, State of New York, E. Jan Nadelman, et al., Defendants.**

United States District Court
S. D. New York.

April 7, 1960.

Harry T. Dolan, Special Asst. to the Atty. Gen., for petitioner-plaintiff.

Skinner, Bermant, Leddy & Raber, New York City, for defendant, E. Jan Nadelman; Harold L. Leddy, and George Bergen, New York City, of counsel.

Hodges, Reavis, McGrath & Downey, New York City, for defendant, American Ice Co.; Denis B. Sullivan, New York City, of counsel.

M. Carl Levine, Morgulas & Foreman, New York City, for defendant, M. Shapiro & Sons, Inc.; Albert Foreman, New York City, of counsel.

KNOX, District Judge.

This condemnation suit was begun on December 23, 1958. On the same day, title to the involved property vested in the United States. As of that date, respondent's damages are to be determined.

The property is known as 222–232 East 55th Street, New York City. It consists of a plot of land on the southerly side of East 55th Street, having a width of 100 feet, and a depth of 100 feet, 5 inches. Its easterly boundary line is 250 feet west from the westerly side of Second Avenue. Its westerly line is 260 feet east from the easterly side of Third Avenue.

Years ago, the land was improved by the erection of a brick and stone, two story building, presently occupied by American Ice Company, and used as an office, and a garage. The block, in which the property is located, and the immediate neighborhood, are characterized by garages, warehouses, stores, and old time tenement houses, interspersed with restaurants and barrooms.

At the moment, the community, generally speaking, is unimpressive. Nevertheless, here and there, one can see that the locality is in the process of redevelopment. By and large, transportation facilities are good. A block, or two, from the premises, improvements of a major character are under way. Barring a serious business recession, the land area of the neighborhood, over a period of years, will be rejuvenated.

At the time of the Government's appropriation, the premises were under lease to the American Ice Company, for a term expiring on December 31, 1960. The rental was $13,000 per annum. The Government, having taken all interests in the property, it will be necessary to fix the value of the leasehold, as well as that of the fee.

At the time of taking, E. Jan Nadelman, owner of the property, was employed by the State Department of the United States, and located in Washington, D. C. When the case was tried, Nadelman was on a mission to Poland, and did not appear as a witness.

Harold L. Duncan was employed by the Post Office Department, as Director of Real Estate. He, too, was stationed in Washington.

Duncan testified that, in 1956, his Department was considering the advisability of locating a post office in the neighborhood of 55th Street, east of Third Avenue. The Nadelman property was part of the proposed site. Negotiations were then in progress with one or more property owners, whose land adjoined, or was close by, Nadelman's property.

In January, 1957, Duncan conferred with Nadelman, in Washington. The latter was told that the Post Office Department had decided to acquire land in New York City, which included his property. Duncan explained that his Department was prepared to acquire an assignable option to purchase Nadelman's real estate; which option, at a later date, could be assigned to "a successful bidder."

Nadelman stated that he had no desire to sell his property. Nevertheless, he would give thought to the matter, and suggested that Duncan talk with Francis A. Armeny, a New York attorney, and arrange a date, on which Armeny, Duncan, and Nadelman, could discuss the situation.

On January 16, 1957, Duncan and Armeny had a conference in New York. Nadelman was not present. Duncan told Armeny of the procedure that the Department wished to follow, in acquiring Nadelman's property. This procedure was not agreeable to Armeny. But, he did say that, if a fair and equitable price could be worked out, he would be willing to recommend to Nadelman that he sell his property to the Government, under a conventional real estate contract.

Duncan attempted to have Armeny suggest his idea as to the value of the property, but he was noncommittal. Duncan said that his Department would procure an appraisal of the property; and that, after doing so, he would like another audience with Armeny.

Thereafter, in September, 1957, the Department secured an appraisal of the

property from the real estate firm of Cross & Brown. About mid October, 1957, Duncan saw Nadelman at the State Department, and attempted to negotiate with him. This availed nothing. However, Nadelman suggested that Duncan have another talk with Armeny. This took place in September, or October, 1958. In the meanwhile, the Government had contracted to purchase a substantial area of the block (82,000 square feet), in which Nadelman's property is located.

In October, 1958, Duncan again talked with Armeny, but the conversation was fruitless. However, the latter intimated that he would recommend that his client sell his property to the Government for something in excess of $400,000.

Thereafter, one or more conferences were held between representatives of the Government, and Armeny, or Nadelman. These were unproductive.

Whether the impasse was attributable to Nadelman, or to the real estate sagacity of Armeny, I do not know. Neither Armeny, nor the Government seems to have been in a hurry. Delay, however, was to the advantage of Nadelman. In other words, through this period of inaction, the value of Nadelman's property increased.

Indeed, upon the trial, Frank Wittman, Nadelman's real estate expert, testified, " * * * the area has been volatile; it is bouyant, it is active, it is dynamic. The trends are upward; there is a constant change in value, which have to be watched carefully, to pinpoint value as of a specific date."

S. Edwin Kazdin, the Government's expert, an experienced man, and conservative in statement, said " * * * the removal of the (Third Avenue) elevated railroad structures, and the contemplation of (their) removal, created * * * activity. There was speculation for the rise; particularly after 1955. This * * area * * *, with the exception * * that prices have been increasing, and there was this speculation * * * it remains, essentially, of the same character it has been, heretofore.

"There has been some new construction, not a great deal of it, but prices have been rising * * . * since the (elevated road) was removed, in line with the speculation that took place on Third Avenue."

Notwithstanding the conferences that had been had between Nadelman and Armeny, on one side, and Post Office officials on the other, Nadelman entered into a contract, dated December 11, 1958, with M. Shapiro & Son, Inc., to sell his property to that concern, for $344,500.

The Shapiro organization is a defendant in this suit. But, at the trial, none of its representatives saw fit to testify; and Nadelman, it will be recalled, was in Poland.

The contract provided that the purported purchaser, on executing the agreement, should pay Nadelman, the sum of $25,000; and this was done. The remainder of the purchase price, may be itemized as follows:

$28,201.42, by the purchaser taking title subject to a mortgage in that amount, bearing interest at 5%, and payable, as to principal and interest, in specified installments;

$291,298.58, by the purchaser, executing a note to the seller, * * * secured by a purchase money mortgage in that amount, * * * payable in installments, as follows:

$29,000 one year from delivery of deed;

$28,000 two years from delivery of deed;

$25,000 three years from delivery of deed;

$25,000 four years from delivery of deed;

$184,298.58, five years from delivery of deed.

The contract further provided that:

"If said mortgage shall be prepaid within the first 21 months of its existence, the principal thereon shall be reduced, in accordance with the following schedule:

"If said mortgage is paid within the first 3 months period, the prin-

cipal * * * shall be reduced by $6,000;

"If paid within the second 3 months period, the principal shall be reduced by $5,000;

"If paid within the third 3 months period, the principal shall be reduced by $4,000;

"If paid within the fourth 3 months period, the principal shall be reduced by $3,000;

"If paid within the fifth three months period, the principal shall be reduced by $2,250;

"If paid within the sixth 3 months period, the principal shall be reduced by $1,500;

"If paid within the seventh 3 months period, the principal shall be reduced by $750."

The contract also provided that the purchase money mortgage of $291,298.58, *"shall bear no interest for the first two (2) years following delivery of the deed* [emphasis supplied]; and, thereafter bear interest at the rate of five percent per annum, payable quarter-annually. The first such payment of interest shall be due and payable two years and three months, after delivery of the deed * *."

Thus, for two years, Nadelman would forego interest on his purchase money mortgage, amounting to about $29,000. This money, had it been received, would yield, at market rates, about $1500 per annum.

It follows that, had the transaction been consummated, and the alleged purchaser taken advantage of his privileges, the purchase price of the premises, in actuality, would have fallen far below the stipulated price of $344,500.

Furthermore, had title passed to the purported purchaser, on December 30, 1958, the closing date, Nadelman would have been deprived of the annual rental of $13,000, being paid by the American Ice Company.

The contract, having been made on December 11, 1958, it would appear that December 30, 1958, was a "short" closing

date. This, I think, is of no particular significance. Nadelman had expected to leave the United States in January, 1959; but, due to no fault of his own, his departure was delayed until April, 1959.

The sales agreement provided that "if the Seller is unable to convey title in accordance with the terms of this contract, the sole liability of the Seller will be to refund the amount paid on account of the purchase price; to pay the net cost of examining the title * * * and the net cost of any survey, in connection therewith * * * Upon such refund * * being made, this contract shall be considered cancelled."

Limitations such as these, ordinarily, are absent from conventional real estate contracts.

Nadelman, after suit was filed, refunded the sum of $25,000, that had been paid by the purported purchaser; and, presumably, the contract was cancelled.

Yet, at the outset of the trial, Albert Foreman, of counsel for M. Shapiro & Son, Inc., addressed the Court, and said, "* * * We represent M. Shapiro & Son, Inc., the [contract] purchaser. We join with Mr. Leddy (representing Nadelman), in an absolute denial of any knowledge of negotiations, or the fact that there was public knowledge, that the Government was going back this far, on this tract of land, or anything in regard to it.

"* * * We sit by with Mr. Nadelman's proof, and then will submit proof * * * as to who is entitled to the proceeds, and the amount to which we may be entitled, as compared to Mr. Nadelman, after your Honor has determined what the value is."

As previously stated, M. Shapiro & Son, Inc. submitted no proof.

Two or three other features of this suit are worthy of comment.

M. Shapiro & Son, Inc., was not a stranger to property on East 55th Street. Indeed, in October, or November, 1958, the Shapiro concern entered into a contract for the purchase of a plot of land, 75 feet in width, which lies on the south side of East 55th Street. While not im-

mediately adjacent to the Nadelman property, it was perhaps 50 feet therefrom.

On December 17, 1958, Jules Shapiro called on Henry Kresse, Regional Real Estate Manager of the Post Office Department in the State of New York. Kresse was familiar with the efforts being made to acquire a post office site on East 55th Street.

Shapiro indicated that he would like to have more than 75 feet of land (apparently already acquired), on East 55th Street; and had learned that the post office department was assembling property for a site on East 54th or 55th Street; Shapiro thought that Kresse might steer him as to how the Shapiro Company could acquire 50 feet of land, owned by Jacob Hoffman Brewing Company, on 55th Street.

Kresse said that the Hoffman property was then owned by the Government, and that the Nadelman land was needed for the assemblage of the post office plottage; and that his Department was then negotiating for its acquisition.

Thereupon, Shapiro told Kresse that, in October, 1958, he had talked with Nadelman by telephone, and been referred to Armeny; and that, on December 11th, a contract for the purchase of Nadelman's property had been made, and the title closing was scheduled for December 30, 1958.

Neither Armeny, nor Nadelman, it appears, had informed Shapiro that they had been in touch with the Post Office Department, concerning the property, which Nadelman had agreed to sell to the Shapiro interests.

Upon learning of such contract, Kresse, on December 19, 1958, telephoned Armeny, and asked for an appointment. Armeny said he could not make an appointment for several weeks. But, he suggested that Kresse call him on the following Monday morning. Kresse made such call, but Armeny was "not in".

There seem to be discrepancies in the testimony respecting these telephone conversations; but, all things considered, they are of little consequence. The fact remains that the conversations, between Jules and Shapiro and Kresse, "touched off" the instant law suit.

Upon being asked, "Why didn't you tell (Kresse) that you were closing this contract?" Armeny replied, "Well, sir, I didn't feel that I was obligated to, and it was not to my client's interest, according to my own lights  *  *  * ".

Speculation as to the real reason for the execution of the Shapiro contract is an idle pastime. Armeny, of course, knew that the contract could not withstand a condemnation suit. He may have thought that the contract would be accepted as proof as to the actual value of the property. Or, possibly, the contract may have been designed to *force* the Government to institute the instant litigation.

Suggestion has been made that Nadelman, being about to go abroad, for an extended sojourn, and his mother being elderly, wished to make provision for her welfare. A condemnation suit, in part, at least, is the equivalent of "cash on the barrel head." An ordinary real estate transaction falls short of this.

In a hearing, held subsequent to the trial, Armeny indicated that he was seeking to protect Nadelman from the impact of heavy income taxes.

But, if this were Armeny's intent, I can't understand why he permitted his client to agree to pay a substantial premium for the prompt payment of the purchase money mortgage that accompanied Nadelman's sale of his property to Shapiro.

Frank Wittman, as previously stated, was Nadelman's real estate expert.

Wittman has followed his calling for 30 years; and has frequently appeared in condemnation proceedings, in Federal and State Courts. In addition, he has engaged in real estate transactions on his own account.

Wittman said that the area, under discussion, is fast becoming a location for multi-story deluxe apartment houses, renting from $700 to $1000 per room.

438

"There are any number of [land] plots which have been assembled, and are now being vacated by tenants, for new building construction. There are a great many sales * * * for assemblage, and reutilization of land for its best improvement. This appears primarily on side street plottages for apartment house sites."

Wittman went on to say:

"A property at 210 East 58th Street, recently constructed, is now being rented. This is also the fact, at 211 East 53rd Street.

"An apartment house has been constructed, and is renting on the northerly side of 53rd Street, between Second and Third Avenues. There is another, on 54th Street, between First and Second Avenues.

" * * * A number of 50 and 75 feet apartments, six stories high, have either been newly constructed, or completely remodeled, for deluxe occupancy. One of them is on the south side of 55th Street, between First and Second Avenues * * *.

"There have been [many] acquisitions of land for potential reuse on the avenues, but they have not yet been built. * * ".

The existing building, on the condemned property, does not represent the best improvement of the land, and, in Wittman's opinion, should be given a negative value. The best improvement would be the erection of a multi-story residential apartment house.

The condemned property, if unencumbered by its present building, and the lease thereon, the value of Nadelman's land, at the time of its appropriation, would have been $440,000. That is $40 per square foot, plus 10% for plottage.

In Wittman's opinion, the demolition of the garage would cost $40,000, and the expense of getting rid of the tenant would be $15,000. These estimated expenditures, of $55,000, he said, should be deducted from the aforementioned $440,000. This being done, Nadelman's damages would be $385,000.

The witness was asked, "Are there any modern improvements adjacent to [the condemned] property?"

The witness replied: "Not adjacent, no. The next adjacent piece to the east, is a plot of 75 front feet, presently being vacated by M. Shapiro & Son, Inc. * * for the purpose of tearing down the building, and putting up apartment houses. This block, at the moment, has no new apartments on it. 54th Street, the next adjacent block, within the boundaries of Second and Third Avenues, has them. 55th Street has newly completed apartment houses, between Second and First Avenues. They rent from $700 to $800 per room, and are one and a half, and two and a half, rooms. There are no vacancies."

In the course of Wittman's testimony, some 15 sales of real estate were introduced in evidence as "comparables". These transactions range over a period of three or four years, and, in discussing them, Wittman took into account certain "variables", or "adjustments", and "weighted them". His comparables may be summarized as follows:

(1) 225–227 East 49th Street. 36' x 107'10", irregular. Deed dated 6/13/56. 2–4 story dwellings. Price $200,000.

(2) 208 East 50th Street. Deed dated 2/14/58. Factory and Storage building, 4 stories, 25' x 60'. Price $75,000.

(3) 140–146 East 50th Street. Deed dated, August 15, 1958, 100' x 100'5". Price $675,000. This transaction has to do with vacant land, now used as a parking lot. It also involves a "sale and leaseback". With its details, I am not fully uninformed. Furthermore, the property is located to the west of Third Avenue. For these reasons, I disregard the transaction, as having no probative value.

(4) 337–339 East 51st Street. Deed dated, December 1, 1955, 37'6" x 100'5". 2–3 story apartments. Price $80,000. This property was resold, by deed dated January 23,

1959, for $100,000. The resale occurred about one month after the appropriation of the land under discussion.

(5) 337–339–341 East 51st Street. Deed dated, May 26, 1959. 56'3" x 100'5" – 3/3 story apartments. Price $225,000. This transaction, it may be noted, took place about *five months* after the Government's acquisition of the condemned property.

(6) 214–216 East 52nd Street. Deed dated, January 23, 1959. 5 story loft and store, 40' x 100'5". Price $300,000.

(7) 335–345 East 52nd Street. Deed dated, September 30, 1955, 100' x 100'5" – 5/5 story apartment. Price $250,000.

(8) 335–345 East 52nd Street. Deed dated June 5, 1958. 120' x 100'5" – 6/5 story apartments. Price $400,000.

(9) 236–238 East 53rd Street. Deed dated, November 17, 1955, 40' x 100'5" – 2/3 story apartments. Price $100,000. This property was resold, on or about February 2, 1959, for $135,000.

(10) 214–224 East 54th Street. Deed dated, March 17, 1959, 150' x 100'5" – 4/3 story lofts. Price $525,000.

(11) 238–242 East 55th Street. Deed dated, May 20, 1959, 75' x 100'5". 3/4 story tenements. Price $225,000. It is interesting to note that, on September 4, 1958, this property was sold to Sutton East Builders, Inc. for $160,000, as against $225,000, on May 20, 1959.

(12) 244 East 55th Street. Deed dated, June 4, 1959, 25' x 100' – 4 story tenement. Price $125,000. The fact is, according to Kazdin, that, on December 29, 1958, a plot of land, 34' x 100'5", on which were erected two converted buildings, sold for $103,500. This sale was within about two weeks of the Government's appropriation; yet, the difference is $21,500.

(13) 155–163 East 56th Street. Deed dated, April 15, 1959, 95' x 100' 5" – 3/3 story and 2/4 story dwellings. Price $480,000. On or about June 1, 1959, this property was resold for $535,000.

(14) 210–218 East 58th Street. Deed dated, January 31, 1958 – 5/3 story apartments, and stores, 100' x 100' 5". Price $400,000.

(15) 234–240 East 54th Street. Deed dated, August 28, 1952. 100' x 100'5". 3 story garage. Price $335,000.

With this data before him, Wittman appraised the subject property as follows:

| | | |
|---|---|---|
| Total land value | | $440,000. |
| Cost of demolition of Improvements | $40,000 | |
| Estimated Cost for obtaining possession | 15,000 | 55,000 |
| Total value, as of 12/31/58, with detriment allowance for improvements, and lack of immediate possession, | | $385,000 |

The sales upon which Kazdin relied, in making his appraisal, are as follows:

(1) 913 Third Avenue, 234–36 East 55th St., 202–218 East 55th St., and 207–221 East 54th Street. 260' x 200'10" x irregular, plus 50' x 100'5". 2 story and basement garage; 4/5 story tenements, and stores. Deed dated, October 31, 1958. Price $1,840,000. This is a portion of the Government's land assemblage.

(2) 238–242 East 55th Street. 75' x 100'5", 3/4 story tenements. Date of sale, September 4, 1958. Price $160,000.

(3) 245–247 East 55th Street. 34' x 100'5". 2–4 story tenements. Sale, December 29, 1958. Price $103,-

500. "Good east and west exposure. Possible corner plottage."

(4) 316–318 East 55th Street. 50' x 100'5" – 2/4 story tenements. Sale October 22, 1957. Price $120,000.

(5) 339–345 East 54th Street. 82' x 100'5" – 4/4 story tenements. Sale, February 27, 1958. Price $207,-500.

(6) 318–324 East 54th Street. 96'4" x 100'5". 4/5 story tenements, and stores. Sale, May 20, 1957. Price $250,000.

(7) 204–210 East 53rd Street. 63'4" x 100'5". 2/5 story tenements. Sale, December 10, 1958. Price $200,100. This property is near subway station and corner of Third Avenue.

(8) 209–223 East 53rd Street. 160' x 100'5". 5, 4, and 3 story buildings. Sale, June 6, 1958. This land, I note, is a large plot, and near Third Avenue, and a subway station. Price $580,425. In 1959, a 12 story apartment was erected.

(9) 229 East 53rd Street. 27'4" x 100'4". 5 story tenement. Sale, April 15, 1957. Price $82,500.

(10) 314–322 East 52nd Street. 95' x 100'5". 2/6 story tenements. Sale, November 20, 1958. January 26, 1959. Price $259,925.

(11) 335–345 East 52nd Street. 120' x 100'5". 6, 5 story apartment houses. Sale, June 5, 1958. Price $400,000. Upon this site a new 13 story apartment house has now been erected.

(12) 228–230 East 52nd Street. 40' x 100'5". –2/3 story apartments. Sale, May 28, 1957. Price $83,-000. In April, 1957, this property was sold for $73,800.

(13) 231–233 East 51st Street. 36'8" x 100'5". 5 story loft building with stores. Sale, January 9, 1957. Price $267,710. This property, it is said, is improved with a good building, and serviced by an elevator.

(14) 238–240 East 50th Street. 37'6" x 100'5". Six story apartment. Sale, May 15, 1957. Price $97,-500.

■ Whatever else the foregoing recital may prove, it does establish that Wittman's citations of sales, numbered 5, 10, 11, 12, and 13, having taken place, long after the Government's appropriation, are irrelevant and immaterial. For this reason, they are stricken from the record.

According to Kazdin, the fair market value of Nadelman's fee, as of December 23, 1958, was $275,000. In his written appraisal, Kazdin said, "The immediate area is improved with a number of garages, fireproof warehouse, New York Telephone Exchange building, and four and five story 'old law' tenements. * *" The immediate area is not consonant with the quality of the neighborhood, East of First Avenue, and West of Lexington Avenue, which have enjoyed a high grade type of residential and business development.

As respects the garage building, Kazdin stated, "[it] contains approximately 19,000 square feet, with a storage capacity for about 100 cars. It is not an economic unit in this location, but it could be operated as a commercial garage; provided additional monies were invested for * * * renovations, including lighting, painting; and curing of deferred structural maintenance. * * * It would be necessary to install car washing equipment, and * * * facilities for the repair and servicing of automobiles. * * * In order to induce an operator to rent this building, and make required improvements, it would be necessary to offer a lease for a minimum term of 10 to 15 years. * * * The fair rental value * * * to such an operator would be * * * approximately $26,500 per annum."

This rental, after taxes, repairs, etc., would yield an estimated net income of $18,500 per year. However, this potential net income is insufficient to support the land value of $275,000 * * *

and produces a negative value for the present structure.

As of December 23, 1958 (the appropriation date), the tenant had a lease with approximately two years to run, at $13,000 per annum. On April 13, 1959, a new lease was negotiated with the Post Office Department, to begin on December 23, 1958, and expire on October 31, 1959, at a rental of $21,500 per annum. Thereafter, the tenant's occupancy was to continue on a month to month basis, at a rental of $1,791.67 per month ($21,500 per annum), and cancellable, by the Department, on 30 days' notice.

This rental, said Kazdin, represented the negotiated market rental value of the premises, in its present condition. Accordingly, the difference between this rental, and the stated rental of $13,000, in the lease (in effect at the time of the Government's appropriation) discounted for a period of two years, and eight days, would represent the value of the tenant's interest. This value, in Kazdin's opinion, is $15,000.

Wittman, it may be remembered, reached a like conclusion.

The American Ice Company called John J. McCormick, as an expert witness, to testify as to the value of the Ice Company's leasehold.

Mr. McCormick has long been identified with real estate transactions within the New York City area. He concluded, after considering pertinent facts, that the Ice Company's unexpired leasehold should be valued at $31,042. His supporting data were meagre, and his appraisal, primarily, was based upon his personal opinion.

█ Without further discussion, I am satisfied that an allowance of $15,000, for the unexpired leasehold of the American Ice Company, is amply sufficient; and its damages in that amount, are hereby fixed.

And now, I face the prime matter for decision—the value of Nadelman's fee. If any one has taken the trouble to analyze the foregoing schedules, having to do with values, at which real estate,

within the area, has changed hands over the past few years, he will quickly realize that speculation is not confined to the stock market. Wild, as price gyrations may be, they, for the moment, at least, represent "values".

Kazdin, in my considered judgment, is a highly competent, and thoroughly honest, real estate man. Yet, in any appraisal of real estate values, there is a margin of error. This, by my own experience, may range from five, to ten percent.

█ In this instance, whatever the percentage may be, I entertain the opinion that the value of Nadelman's fee should be fixed at $290,000. Subtracting from this sum, the value of the leasehold estate, figured at $15,000, Nadelman's damages should be fixed at $275,000.

Such will be the order of the Court.